Filed 10/14/14  P. v. Gudiel CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B246976 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA068885) |
| v. | |
| ARNOLDO GUDIEL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Katherine Anne Stoltz, Judge.  Affirmed.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Arnoldo Gudiel was convicted by a jury of continuous sexual abuse of a child under 14 years old and committing a lewd act on a child under 14 years old. On appeal Gudiel contends the court deprived him of a fair trial by making a disparaging comment about him during voir dire; admitting irrelevant and prejudicial evidence, including expert testimony on child sexual abuse accommodation syndrome; and failing to instruct the jury on the limited use of certain evidence. He also contends, to the extent he has failed to preserve any of these arguments on appeal, his trial counsel was constitutionally ineffective in failing to object to the errors at trial. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The Operative Third Amended Information*

Gudiel was charged in the operative third amended information filed on July 10, 2012 with one count of continuous sexual abuse of his live-in girlfriend's daughter, Shandy G., a child under 14 years old, during the period March 20, 2005 through October 17, 2010 (Pen. Code, § 288.5, subd. (a))[1] (count 1) and one count of committing lewd conduct on a child under 14 years old on or about October 18, 2010 (§ 288, subd. (a)) (count 3).[2] Gudiel pleaded not guilty.

2. *The Evidence at Trial*

Gudiel became romantically involved with Sandra Jimenez, Shandy's mother, when Shandy (born in 1997) was three years old. He later moved in with them, and they lived together as a family. He and Jimenez had two children together, a son born in March 2005 and a daughter born in October 2006. Shandy considered Gudiel her stepfather.

---

[1]    Statutory references are to the Penal Code unless otherwise indicated.

[2]    Guidel had previously been charged with two counts of committing lewd conduct on a child under 14 years old, as well as one count of continuous sexual abuse of a child under 14 years old. A jury found him not guilty on one count of committing lewd conduct but was unable to reach a verdict on the other two charges. After a mistrial was declared as to those two counts, they were recharged in a slightly revised form in the operative third amended complaint.

Shandy testified Gudiel sexually abused her on a frequent basis during the period January 2005 through October 17, 2010. Prior to October 2008, Gudiel on numerous occasions touched Shandy's breast area under her clothes with his hands and his mouth and "touched" her vagina with his hands, mouth and penis. In October 2008, after the family moved and Gudiel acquired a minivan, the abuse became both more consistent and more pervasive: Gudiel would take Shandy with him on an errand in the minivan, stop the minivan in a parking structure adjacent to their apartment building and instruct Shandy to lie down in the back area of the vehicle. Once Shandy complied, Gudiel would move to the back of the minivan, remove her clothes, pull down his own pants and, using a condom, rub his penis against her vagina while he moaned. He also used his hands and mouth to touch Shandy's breasts. After he ejaculated, he would remove the used condom and throw it into a nearby dumpster. This pattern of abuse occurred frequently between October 2008 and October 17, 2010.

On October 18, 2010 Gudiel took Shandy and her little sister on an errand in the minivan. When they returned, they saw Jimenez outside their apartment building talking with a relative. After greeting Jimenez and the relative, Gudiel pulled into the adjacent structure and parked. With Shandy's younger sister asleep in her car seat, Gudiel sexually assaulted Shandy in the back of the minivan in the same manner as on previous occasions, albeit with one exception: This time he stopped before ejaculating and told Shandy to get dressed. He put his own clothes back on and returned to the driver's seat. Jimenez walked into the parking structure and saw shadows of people moving from the back of the minivan to the front of the vehicle. Curious and confused by the apparent movement in the minivan, she opened the sliding side door and found Shandy lying down, fully clothed, in the back of the vehicle. Jimenez asked Shandy why she was lying down since she had been in the front passenger seat when Jimenez had seen them pull into the garage five minutes earlier. Shandy did not respond. Gudiel, whose face appeared very red, told Jimenez Shandy was resting because she had a headache. When Jimenez questioned Shandy later without Gudiel present, Shandy told her about the continuing abuse. Shandy had not told her mother earlier because Gudiel had sworn her

3

to secrecy and warned she could be taken away from Jimenez if the abuse were discovered. She also thought it would make her mother sad. Jimenez told Shandy she believed her and, after taking a day to think about how to proceed, called the police.

While in custody in a Los Angeles County jail, Gudiel called Shandy and Jimenez on the telephone. During the conversation, which was conducted entirely in Spanish (Gudiel's and Jimenez's native language) and recorded by the Los Angeles Police Department, Gudiel told Jimenez, "yes I did touch [Shandy]" but only once. He urged Jimenez to ask Shandy whether she had "come on" to him and tearfully expressed his hope that one day Jimenez could forgive him. He said he would ask God to forgive and help him. Gudiel also spoke to Shandy during the conversation and asked her to forgive him. Gudiel asked Jimenez to withdraw the accusation against him and said, if she did, he would move far away from the family and never see the children again. The recorded conversation was played for the jury. In addition, the jury was given a written transcript of the conversation, translated into English. Gudiel's counsel stipulated the transcript was an accurate English translation of the conversation.

During her trial testimony Shandy often appeared reluctant to answer questions, stating she did not want to talk about the abuse and wanted to forget it had happened. Joyce Medley, a licensed marriage and family therapist, testified as an expert witness on child sexual assault accommodation syndrome (CSAAS), which she explained consisted of a cluster of behaviors often observed in child sexual abuse victims. She explained the pattern had five identifiable behaviors—secrecy, helplessness, entrapment, accommodation and delayed, and often unconvincing, disclosure of the abuse. Medley's testimony consisted of identifying the patterns of behavior and explaining the reasons such behaviors, including a reluctance to report the abuse, were exhibited by child victims of sexual abuse. She also acknowledged she did not know the facts of this case and did not offer an opinion as to whether Shandy met the criteria for CSAAS.

Gudiel testified in his own defense and denied sexually abusing Shandy. When Jimenez opened the door to the minivan on October 18, 2010 and saw Shandy, Gudiel had just hit Shandy hard on the bottom of her foot as punishment for taking her seatbelt

4

off prematurely. He asked Jimenez and Shandy for forgiveness because he had never before physically disciplined Shandy and he felt guilty for it. He told Jimenez during the recorded telephone call that he had "touched" Shandy because he did not want to admit he had hit her. When he asked Jimenez to inquire whether Shandy had ever come on to him, he simply meant for Jimenez to inquire whether Shandy was seeking attention with these accusations.

William O'Donohue, a clinical psychologist, testified as an expert witness for the defense. He discussed in detail the problems of suggestibility and false memory that can arise when adults interview children about sexual abuse. He also explained the behaviors identified with CSAAS generally do not occur in cases in which the child's accusation is believed from the beginning.

Deborah Dotson, Shandy's fifth grade teacher in the 2007-2008 academic year, testified Shandy did not disclose to her she had been abused. Dotson acknowledged she was not trained in detecting sexual abuse and did not have a particularly close relationship with Shandy.

3. *The Verdict and Sentence*

The jury found Gudiel guilty on both counts. The trial court sentenced Gudiel to an aggregate state prison term of 15 years, 12 years (the high term) for count 1 and a full and consecutive three years (the low term) for count 3.

## DISCUSSION

1. *The Court's Comments During Voir Dire Were Not Improper*

After administering the oath to potential jurors, the court stated as part of its introductory remarks to the jury venire, "The next thing I am going to do is tell you the nature of the charges in the case and just a little bit about the case. And let me just stress to you that these are only charges and are not in any sense evidence against Mr. Gudiel. So this is just was the prosecutor claims happened. I am not telling you that this is what happened. That's what we are here to find out, okay? So these are just charges." The court identified the charges in the information and told the jury it would then entertain any excuses for not being able to serve as a juror. The court explained jury service was

5

an important civic duty and it would not be easy to be excused from service. It stated, "I don't want you to raise your hand and say, 'oh, judge, I can't be fair because I don't like child molesting.' Of course you don't like child molesting. Most people don't. You can't expect me to try this case with a full jury of people who like child molesting, okay? That wouldn't be realistic. . . . The issue is whether or not you can be fair and impartial, and that's whether or not you can set aside your feelings and decide this case with your mind, okay? That's what the attorneys are looking for. They're looking for jurors who can decide this case just looking at the evidence and in their mind decide on a fair result, okay, without letting their feelings or their emotions affect their judgment."

Before dismissing potential jurors for the day, the court ordered them "not to discuss the case with anyone, and that includes with your friends, your relatives, your coworkers, your husband, your wife, your best friend in the whole world. . . . Don't even tell them the charges. Because if you go running home and say 'Oh, I am on a child molesting case,' you know they're going to go, 'Oh, you know, this is what I think about child molesters' and they are going to start to try to influence you, and we don't want that to happen."

Gudiel, whose counsel did not object to the comments, contends the court's remarks "effectively told the jury panel that [he] was a child molester," prejudicing the jury venire and depriving him of the ability to obtain a fair trial. To overcome the bar of forfeiture (see *People v. Houston* (2012) 54 Cal.4th 1186, 1220 [claim of judicial misconduct forfeited when an objection could have cured the prejudice and there was no reason to conclude objection would be futile]), he asserts his counsel was constitutionally ineffective in failing to object to the comments when they were made. Assuming arguendo Gudiel has presented a cognizable claim,[3] it fails on its merits. Far from

---

[3] The Attorney General contends Gudiel has not presented a cognizable claim of judicial misconduct because he cannot show any of the potential jurors who heard the remarks actually served on the jury. The court's comments occurred during the voir dire of an initial panel. According to the Attorney General, other potential jurors were brought after the initial venire was depleted; and the subsequent voir dire proceedings, although transcribed, are not included in the record on appeal. (See *In re Kathy P.* (1979)

6

labeling Gudiel a child molester, the court's comments provided an appropriate explanation of the difference between charges and evidence and properly described the jurors' obligation to set aside their personal views relating to the nature of the charges and to decide the case based solely on the evidence presented. Because none of the identified comments was objectionable, much less prejudicial, Gudiel cannot show his counsel was constitutionally ineffective in failing to object to them. (See *People v. Boyette* (2002) 29 Cal.4th 381, 430-431 [to establish a violation of the criminal defendant's constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was constitutionally deficient and the deficient performance resulted in prejudice]; *People v. Kipp* (1998) 18 Cal.4th 349, 366 [same]; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674].)

2. *Gudiel Has Forfeited His Objection to the Admission of the Spanish Audio Recording*; *His Counsel Was Not Constitutionally Ineffective in Failing To Object to It*

During trial the court, the prosecutor and defense counsel engaged in a lengthy colloquy outside the presence of the jury concerning the recorded jailhouse telephone conversation. The People argued the audio recording should be played for the jury even though it was in Spanish because the emotion and vocal inflections of Gudiel, Jimenez and Shandy during the conversation were probative of the credibility of their statements. The defense did not object to the recording being played, but requested that a certified court interpreter translate the recording into English contemporaneously with it being played. The court responded that it would impose too great a burden on the interpreter to translate the recording in this manner, a view echoed by the certified court interpreter in the courtroom. The court stated it would admit into evidence the English-language transcript of the conversation and would allow the jury to refer to it while listening to the audio tape recording.[4] Defense counsel did not object to this approach but expressed

_____

25 Cal.3d 91, 102 [appellant bears burden of demonstrating error from record]; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 549-550 [same].)

[4] Although it found the simultaneous use of the Spanish recording and English transcript somewhat "unusual," the court agreed with the People it would aid the jury to

7

concern the transcript had been prepared by the Los Angeles Police Department and requested the opportunity to have it reviewed for accuracy before giving it to the jury. The court agreed. At the court's suggestion, a certified court interpreter reviewed the transcript and the audio recording during the lunch recess to determine whether the transcript provided an accurate translation. The interpreter confirmed the transcript was accurate except for a few minor ("nonsubstantive") changes, which she made. After this occurred, the court inquired whether defense counsel intended to call the interpreter as a witness to testify as to the accuracy of the English transcript. Defense counsel replied he had spoken to the interpreter and would "stipulate the [modified] transcript is correct without testimony." The court then instructed the jury, "Ladies and Gentlemen, a stipulation is an agreement by the attorneys as to the facts and should be seen as true. So we are stipulating that the transcript is an accurate transcript of what—accurate translation of what's on the tape."[5] The court also instructed the jury at the close of evidence: "During the trial, you were told that the People and the defense agreed, or stipulated, to certain facts. This means they both accept those facts as true. Because there is no dispute about those facts you must also accept them as true."

Gudiel contends it was error to admit the recording of the telephone conversation into evidence because it resulted in "some of the jurors [those who understood Spanish] receiving different evidence than the others." Gudiel did not object to the admission of

---

listen to the recording and to simultaneously refer to the English transcript. The court ruled the interpreter would assist the jury by advising them when it was time to turn the page of the English transcript.

[5] The court also advised the jury the portions of the transcript that identified the speaker and stated whether a speaker was crying or "weeping" were not included in the stipulation: "The voices are labeled here with names. There is no agreement that those are the voices on the transcript. For that, you have to rely upon the evidence and make your own determination as to whose voices are on the tape. . . . There are places here where it says 'crying' and 'weeping.' That is just a person's opinion, a layperson's opinion, as to what is happening on the transcript. It's just to help you follow along so you can see where we are in the transcript. But that's just one person's opinion. You should disregard that in terms of being opinion. You can make up your own mind as to what's happening . . . ."

the recording and thus has failed to preserve this argument for appeal. (Evid. Code, § 353, subd. (a) [judgment will not be reversed due to the erroneous admission of evidence unless "an objection to or a motion to exclude or to strike the evidence . . . was timely made and so stated as to make clear the specific ground of the objection or motion"]; *People v. Houston, supra,* 54 Cal.4th at p. 1213.)

Gudiel's related claim his counsel was constitutionally ineffective for failing to object to the introduction of this evidence also fails. This assertion is entirely speculative. Nothing in the record on appeal suggests, let alone establishes, there were Spanish speakers on the jury.[6] Beyond this speculative argument, Gudiel does not challenge the propriety of admitting the transcript into evidence or his counsel's stipulation the transcript provided an accurate translation of the conversation. In fact, in his trial testimony Gudiel admitted he had made the recorded statements as translated, but offered his own explanation as to their intended meaning. Accordingly, there was no basis for counsel to object to the admission of the audio recording and certainly no prejudice as a result of its admission into evidence. (See *People v. Kipp, supra,* 18 Cal.4th at p. 366 [if alleged error not prejudicial—that is, not reasonably probable that the defendant would have received a more favorable verdict in the absence of the error— reviewing court may dispose of ineffective assistance of counsel claim without evaluating whether counsel's conduct was deficient]; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219.)

---

[6] The record, in fact, belies Gudiel's assertion that some jurors understood Spanish. The court stated it had listened to the tape "to make sure the jury would be able to follow the words on the tape with the transcript even though they don't understand Spanish" and concluded "I think they can follow the transcript even though they don't speak Spanish." Apart from the court's comments, which were not objected to, the record is silent on this point. (Cf. *People v. Gonzales* (2008) 165 Cal.App.4th 620, 625 [record of voir dire proceedings reflected at least five prospective jurors expressly indicated they understood Spanish].)

9

3. *The Trial Court Adequately Instructed the Jury Concerning Its Duty To Accept the Transcript of the Recorded Conversation as a True and Accurate Translation over Any Other Understanding*

Gudiel acknowledges the jury was instructed with CALCRIM No. 121, alternative A, requiring it to accept the interpreter's translation of testimony over its own,[7] but contends the court had a duty to instruct sua sponte with alternative B of CALCRIM No. 121, specifically pertaining to foreign language recordings.[8] Although his counsel did not request either instruction, he argues the court was required to instruct jurors to rely on the English transcript rather than their own understanding of the recording. (Cf. *People v. Cabrera* (1991) 230 Cal.App.3d 300, 303 [it is misconduct for juror to rely on his translation rather than interpreter's translation].)

Citing the bench notes to CALCRIM No. 121, the Attorney General insists there is no duty to give either version of the instruction sua sponte. (See Bench Notes, CALCRIM No. 121 ["The committee recommends giving Alternative A of this instruction whenever testimony will be received with the assistance of an interpreter, though no case has held that the court has a sua sponte duty to give the instruction. The instruction may be given at the beginning of the case, when the person requiring translation testifies, or both, at the court's discretion. If the jury may hear a recording

---

[7] CALCRIM No. 121, alternative A, provides, "Some testimony may be given in <insert name or description of language other than English>. An interpreter will provide a translation for you at the time that the testimony is given. You must rely on the translation provided by the interpreter, even if you understand the language spoken by the witness. Do not retranslate any testimony for other jurors. If you believe the court interpreter translated testimony incorrectly, let me know immediately by writing a note and giving it to the (clerk/bailiff)." The court gave this before witnesses testified in Spanish through the assistance of a Spanish language interpreter but did not include it in the written instructions provided to the jury prior to its deliberations.

[8] CALCRIM No. 121, alternative B, provides, "You (may/are about to) hear a recording in a foreign language. You will receive a transcript with an English language translation of that recording. You must rely on the transcript, even if you understand the language in the recording. Do not share your own translation with other jurors. Please write a note to the clerk or bailiff if you believe the translation is wrong."

10

that is at least partially in a foreign language, the court may give Alternative B with the appropriate bracketed language, as needed."].)

Although it would have been better practice to have instructed the jury with CALCRIM No. 121, alternative B, the court's other instructions fully satisfied whatever obligation it had to instruct that the English translation of the recording controlled over any contrary understanding that might have been derived from a juror's comprehension of Spanish. At the time the recording was played, the court expressly advised the jury that the prosecutor and defense counsel had stipulated the transcript was an accurate English translation of the recorded conversation and made clear the jury was obligated to accept that fact as true. The court reiterated that instruction twice more during the trial and included it among the written instructions provided to the jury before deliberations began. Those instructions adequately informed the jury of its obligation to accept the transcript and nothing else. (See *People v. Hughes* (2002) 27 Cal.4th 287, 360 ["'''''[w]hether a jury has been correctly instructed is not to be determined from a consideration of parts of an instruction or from particular instructions, but from the entire charge of the court'''''"]; *People v. Tapia* (1994) 25 Cal.App.4th 984, 1027 [same].) We presume the jury understood and followed these directions. (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) Moreover, as explained, there is no apparent discrepancy between the transcript and the contents of the audio recording. On this record, any error in omitting the instruction was necessarily harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705] [applying beyond-a-reasonable-doubt standard of review to errors of constitutional magnitude]; *People v. Breverman* (1998) 19 Cal.4th 142, 165 [recognizing that instructional errors are reviewed under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836].)

4. *Gudiel Has Forfeited His Objection to the Admission of Expert Testimony on CSAAS; and His Counsel Was Not Ineffective in Failing To Object To It*

Gudiel contends the trial court erred in admitting Medley's expert testimony on CSAAS. Gudiel acknowledges such evidence has been held admissible to disabuse commonly held misconceptions about a child's post-abuse actions, including a delay in

11

reporting.  (See *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 [discussing with approval use of CSAAS expert testimony "to rehabilitate [a] witnesses's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation"]; *People v. Brown* (2004) 33 Cal.4th 892, 906 [same]; *People v. Bowker* (1988) 203 Cal.App.3d 385, 394 [expert testimony about CSAAS is properly admitted to describe or explain common reactions of children to molestation]; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744 [CSAAS evidence is admissible for "the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation"].)  Nonetheless, he argues such expert testimony is no longer necessary in today's world where crime dramas such as "Law and Order Special Victims Unit" have served in the past decade "to enlighten the general public" on common patterns of behavior found in victims of child sexual abuse.  (See Evid. Code, § 801, subd. (a) [expert testimony admissible only when related to subject that is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact"].)

Gudiel failed to object to the CSAAS evidence at trial and thus has forfeited the argument on appeal.  (*People v. Houston, supra,* 54 Cal.4th at p. 1213; Evid. Code, § 353.)  We also reject Gudiel's argument that expert testimony would not have assisted the jury and adhere to the wealth of authority recognizing the admissibility of CSAAS testimony in cases such as this one in which the victim's credibility and, in particular, her delayed disclosure of the abuse were directly at issue.  (See *People v. Brown, supra,* 33 Cal.4th at p. 906; *People v. McAlpin, supra*, 53 Cal.3d at p. 1300; *People v. Patino, supra,* 26 Cal.App.4th, at p. 1744.)  Because the evidence was properly admitted, Gudiel's counsel was not deficient in failing to object to it.  (*People v. Weaver* (2001) 26 Cal.4th 876, 931 [counsel has no duty to make frivolous or futile objections]; *People v. Memro* (1995) 11 Cal.4th 786, 834 [same].)

12

5. *The Trial Court's Failure To Instruct Sua Sponte with CALCRIM No. 1193, Even if Error, Was Not Prejudicial*

Even if the CSAAS evidence was properly admitted, Gudiel argues the trial court's failure to give CALCRIM No. 1193, the Judicial-Council-approved jury instruction concerning the limited use of CSAAS evidence,[9] was prejudicial error.[10] Generally, absent a request by a party, there is no duty to give an instruction limiting the purpose for which evidence may be considered. (*People v. Smith* (2007) 40 Cal.4th 483, 516; cf. Evid. Code, § 355 ["[w]hen evidence is admissible as to one party for one purpose and is inadmissible as to another party for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"].) However, because of the potential for misuse of CSAAS evidence, the court in *People v. Housley* (1992) 6 Cal.App.4th 947 (*Housley*) held a trial court has a duty to instruct sua sponte with limiting language similar to that now found in CALCRIM No. 1193 whenever CSAAS evidence is presented: "Such testimony, especially from one recognized as an expert in the field of child abuse, easily could be misconstrued by the jury as corroboration for the victim's claims; where the case boils down to the victim's word against the word of the accused, such evidence could unfairly tip the balance in

---

[9] CALCRIM No. 1193 provides, "You have heard testimony from ___ *<insert name of expert>* regarding child sexual abuse accommodation syndrome. [¶]___'s *<insert name of expert>* testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against (him/her). [¶] You may consider this evidence only in deciding whether or not ____'s *<insert name of alleged victim of abuse>* conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of (his/her) testimony.

[10] Defense counsel proffered his own lengthy instruction to advise the jury on how to use CSAAS evidence. The court rejected the proffered instruction, and defense counsel conceded it was unnecessary as long as the standard instruction on expert testimony, CALCRIM No. 332, was given. Gudiel's arguments on appeal are limited to the court's duty to instruct sua sponte with CALCRIM No. 1193 and do not address the court's ruling rejecting his counsel's proposed instruction.

13

favor of the prosecution. A simple instruction similar to that described in *Bowker*[11] would clearly define the proper use of such evidence and would prevent the jury from accepting the expert testimony as proof of the molestation. Furthermore, requiring such an instruction would avoid potentially erroneous convictions occasioned by counsel's inadvertent or incompetent failure to request a limiting admonition. . . . Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Housley*, at pp. 958-959; cf. *People v. Bowker, supra,* 203 Cal.App.3d at p. 394 [recognizing need for limiting instruction when CSAAS evidence is admitted]; but see *People v. Stark* (1989) 213 Cal.App.3d 107, 116 [limiting instruction on CSAAS evidence to be given "if requested"].)

While finding it error not to give a limiting instruction on CSAAS evidence even if not requested, the *Housley* court held the failure to do so in the case before it was harmless because there was no reasonable likelihood the jury misunderstood or misapplied the expert testimony as proof the molestation occurred. In reaching its conclusion the court found significant that the expert witness "twice told the jury she had not met the victim and had no knowledge of the case. Her testimony was couched in general terms, and described behavior common to abused victims as a class, rather than any individual victim." (*Housley, supra,* 6 Cal.App.4th at p. 959.) Similarly, in the instant case Medley made clear she had not discussed the case with the prosecutor, had no knowledge of the facts of the case and no opinion whether Shandy met the criteria for CSAAS or whether she was, in fact, abused. Like the court in *Housley,* we have little difficulty in this case concluding any error in failing to instruct sua sponte with

---

11     See *People v. Bowker, supra,* 203 Cal.App.3d at p. 394 ["the jury must be instructed simply and directly that the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true"].)

14

CALCRIM No. 1193 was harmless; it was not reasonably probable Gudiel would have received a more favorable verdict had an appropriate limiting instruction been given. (*People v. Watson, supra,* 46 Cal.2d at p. 836; *Housley,* at p. 959.)[12]

## DISPOSITION

The judgment is affirmed.

PERLUSS, P. J.

We concur:

WOODS, J.

ZELON, J.

---

[12] Because we hold any error in failing to instruct with CALCRIM No. 1193 to be harmless, we need not address Gudiel's contention his counsel provided ineffective assistance by failing to request CALCRIM No. 1193. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217 [failure to establish prejudice is fatal to ineffective assistance of counsel claim].)